**In the United States District Court
for the District of Kansas**

---

Case No. 20-cv-02364-TC

---

ERASMO SERRANO,

*Plaintiff*

v.

STANDARD INSURANCE COMPANY,

*Defendant*

---

**MEMORANDUM AND ORDER**

Plaintiff Erasmo Serrano, M.D., brings this action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), seeking to recover unpaid disability benefits under a Long Term Disability plan issued by Defendant Standard Insurance Company. Serrano challenges Standard's decision to apply a 24-month limitation to his claim for benefits. Serrano and Standard filed cross-motions for summary judgment. Docs. 29 & 32. For the following reasons, Standard's motion for judgment on the administrative record, Doc. 29, is granted, and Serrano's motion for summary judgment, Doc. 32, is denied.

**I**

**A**

The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, gives plan beneficiaries the right to review by a federal court. 29 U.S.C. § 1132(a). In ERISA cases where both parties move for summary judgment and stipulate that trial is unnecessary, "summary judgment is merely a vehicle for deciding the case." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010). The normal process under Rule 56 is not "completely suited to the court's review

of the administrative record in an ERISA action." *McNeal v. Frontier AG, Inc.*, 998 F. Supp. 2d 1037, 1040 (D. Kan. 2014). Instead, the district court "acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision" based solely on the administrative record and without drawing inferences in the non-moving party's favor. *Panther v. Synthes (U.S.A.)*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005); *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (quoting *LaAsmar*, 605 F.3d at 796).

When a plaintiff seeks review of a plan administrator's benefits denial, there are two possible standards of review. *Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669, 675 (10th Cir. 2019) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *see also Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). The default standard is de novo review. *Hodges*, 920 F.3d at 675. But when a plan expressly confers discretion to the administrator or fiduciary, the district court inquires only whether the denial of benefits was arbitrary and capricious. *Id.* (citing *LaAsmar*, 605 F.3d at 796). That deferential standard of review applies here because the parties do not dispute that the LTD plan vested discretion in Standard to administer the plan. Doc. 33-1 at ¶ 77; Doc. 30 at ¶ 12; Adm. Rec. 77–78.[1]

The plan administrator's decision will be upheld under an arbitrary and capricious standard "so long as it was made on a reasoned basis and supported by substantial evidence." *Van Steen v. Life Ins. Co. N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018) (citing *Graham v. Hartford Life & Accident Ins. Co*, 589 F.3d 1345, 1357 (10th Cir. 2009)). In other words, that decision stands "unless it is not grounded on *any* reasonable basis." *Graham*, 589 F.3d at 1357 (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)). The district court considers only "the arguments and evidence before the administrator at the time it made that decision." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992).

Substantial evidence is "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker." *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1119–20 (10th Cir. 2006). "It requires 'more than a scintilla but less than a preponderance.'" *Id.* at 1120 (quoting *Sandoval*, 967 F.2d at 382). "Substantiality

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF except for factual references to the Administrative Record (Adm. Rec.).

of the evidence is based upon the record as a whole. In determining whether the evidence in support of the administrator's decision is substantial, [the court] must take into account whatever in the record fairly detracts from its weight." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (citation, alteration, and internal quotation marks omitted). Decisions that suffer from "lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary" are suspect. *Graham*, 589 F.3d at 1357 (citation omitted).

**B**

Serrano asserts that he is entitled to long term disability benefits under an insurance policy issued by Standard Insurance Company. He applied for disability benefits after having rotator cuff surgery, was initially denied benefits, appealed, and later received benefits not for his shoulder but rather for mental health conditions. That designation had consequences: unlike for physical injuries, Serrano's Long Term Disability plan limited his benefits for a mental health disability to two years. Doc. 30 at ¶¶ 16–17. Serrano alleges, however, that his disability was the result of physical injuries, which entitles him to extended benefits. Doc. 33-1 at 43.

**1.** Serrano, a board-certified internal medicine doctor, worked as an emergency room physician for The University of Kansas Physicians.[2] Adm. Rec. at 1295–96, 1304. The University of Kansas Physicians sponsored an employee welfare benefit plan that provided disability benefits to qualifying participants under the terms of a Long Term Disability plan. Doc. 30 at ¶ 9. Standard Insurance Company provided the disability plan and issued an LTD plan number to Serrano. *Id.* at ¶ 10; Adm. Rec. at 55–82.

Serrano applied for LTD benefits in February 2017, less than three weeks after surgery on his left rotator cuff. Adm. Rec. at 589, 1259. In his application for LTD benefits, Serrano claimed he was unable to work due to adrenal insufficiency and chronic low back pain. *Id.* at 1256. He also noted rotator cuff and right biceps tendon tears and a history of depression. *Id.* at 1257–58. Serrano appeared to suffer no

---

[2] The University of Kansas Hospital Authority initially hired Serrano. After it reorganized, he was hired by The University of Kansas Physicians. *Compare* Adm. Rec. at 1304 (identifying The University of Kansas Hospital Authority as Serrano's employer), *with* Doc. 33-1 at ¶ 4 (referring to The University of Kansas Physicians as Serrano's employer), *and* Doc. 30 at ¶ 7 (same).

3

complications from his rotator cuff surgery and returned to work at the hospital in March 2017. *Id.* at 1199. Three months later, his employment agreement expired. *Id.*

Upon receipt of Serrano's claim, Standard began evaluating his medical history. Adm. Rec. at 1199. Standard opened a claim file and collected documents from Serrano, his physicians, and his then-employer. Doc. 30 at ¶ 21. Those documents included Serrano's medical records from Dr. Mayorga (psychiatrist), Wendy Born (counselor), Dr. Kennedy (primary care), Dr. Bhattacharya (endocrinologist treating adrenal insufficiency), and Dr. Schroeppel (orthopedic surgeon). Adm. Rec. at 1200. Combined, these reports totaled over 700 pages. *See id.* at 1428–2143.

The medical records—and associated reviews by Standard's independent consultants—illustrate Serrano's complex medical picture. Beyond his shoulder issues, Serrano was being treated for adrenal insufficiency, chronic pain and associated use of large doses of opioids, hypertension, chronic fatigue, insomnia, sleep apnea, and lumbar degenerative disc disease. *See* Adm. Rec. at 570–76. He also suffered from depression, anxiety, and adult ADHD. *Id.*

Based on the records collected, Standard referred Serrano's case to Dr. Duncan, a Behavioral Health Case Manager. Adm. Rec. at 605. Duncan interviewed Serrano for an hour about his mental health, use of opioids, and physical conditions, including shoulder issues, chronic pain, and adrenal insufficiency. *Id.* 605–07. Serrano discussed his move from overnight shifts based on his endocrinologist's recommendation to "reset his adrenal action." *Id.* at 606. Serrano's case was also referred to a psychiatry consultant, Dr. Conant, and an orthopedic consultant, Dr. Mandiberg. *See id.* at 588. In a July 2017 review, Mandiberg restricted Serrano to lifting no more than ten pounds due to a right biceps tear but was unable to predict how long this limitation would apply due to a lack of postoperative notes. *Id.* at 589. Mandiberg also noted "a long history of chronic pain [and] high narcotic use." *Id.*

Meanwhile, Conant found that Serrano's use of opioids for pain management supported a diagnosis of opioid dependence. Adm. Rec. at 593. In his July 2017 review, Conant wrote that Serrano's daily use of 300 milligrams of a morphine equivalent was far above the 90 milligrams the CDC recommends. *Id.* Conant described how Serrano's opioid dependence "causes him to have no capacity to safely engage in medical decision-making or delivery of medical treatments to

4

patients." *Id.* He suggested that Serrano "could participate in administrative duties that do not involve direction or delivery of medical treatment to patients." *Id.* He concluded that the information available to him "supported a diagnosis of major depressive disorder," which could be exacerbated by working night shifts or greater than forty hours per week, and that there was a limited probability that Serrano's "opioid dependence will remit in the future." *Id.*

Standard also evaluated the scope of Serrano's job duties to determine if he had a disability that prevented him from continuing in his occupation. Doc. 30 at 11; Adm. Rec. at 1283. According to the LTD plan's "Definition of Disability," a participant is disabled if he is "unable to perform with reasonable continuity the Material Duties" of his "Own Occupation." Adm. Rec. at 63–64. As a physician board certified in internal medicine, Serrano's "Own Occupation" was "as broad as the scope of [his] license." *Id.*; Doc. 30 at 22; *see also* Doc. 37 at 9.

To assess whether Serrano was disabled under the LTD plan, Standard conducted a vocational analysis of his file and the policy language. Adm. Rec. at 1283–94. Susan Martin, a Vocational Case Manager, identified several possible roles Serrano could fill with his medical license in sedentary or light-level jobs, including Medical Director, Global Medical Safety Director, or Medical Safety Officer. *Id.* at 1287–89. Serrano did not submit any vocational expert opinions of his own. Doc. 30 at ¶ 30.

Standard denied Serrano's claim for LTD plan benefits in August 2017. Adm. Rec. at 1199–1203.[3] Standard based its denial on the fact that Serrano returned to work approximately one month post-surgery with "no change in the scope of [his] duties and responsibilities." *Id.* at 1200. Further, based on Martin's vocational review, Serrano could perform alternative occupations such as Medical Director and, so, did not meet the LTD plan's "Own Occupation Definition of Disability." *Id.* at 1201. Standard found that Serrano could perform these alternative

---

[3] Standard also insured Serrano under an Individual Disability Income policy. *See* Doc. 30 at 23 n.7. The IDI policy contained a different definition of Own Occupation. *Id.* Standard originally denied Serrano's IDI claims but, after an administrative review, concluded that Serrano qualified for the definition of Total Disability in one of the IDI policies "due to symptoms of either major depressive disorder or an adjustment disorder with mixed anxiety and depression." Adm. Rec. at 1182. Serrano received those benefits, *id.* at 1164, 1173, and is not making a claim based on the IDI policy.

occupations despite his "opioid dependence" because these occupations did not "involve patient care." *Id.*

In its denial letter, Standard referenced Serrano's chronic low back pain and adrenal insufficiency, which necessitated his reassignment to the patient observation unit, the position he held from 2014 until his 2017 termination. Adm. Rec. at 1199–1200. Standard also noted that its consultants confirmed Serrano's mental health diagnoses of major depressive disorder, generalized anxiety disorder, and opioid dependence. *Id.* at 1200. Standard informed Serrano of his right to seek review of the decision and directed him to notify Standard in writing within 180 days if he sought a review of their decision. *Id.* at 1202. It also notified Serrano that he could submit any supporting information or documentation that might change Standard's decision. *Id.*

**2.** Serrano appealed Standard's denial. Adm. Rec. at 1188–92. In a December 2017 letter from his counsel to Standard, Serrano "vehemently disagree[d]" with Standard's position that he could hold alternative occupations such as Medical Director. *Id.* at 1191. Serrano maintained that he could not "apply for and receive a job in those positions" given his physical and mental disabilities and addiction to opioid medications. *Id.*

Standard referred Serrano's file to its Administrative Review Unit for reconsideration. Adm. Rec. at 1185. In January 2018, Standard notified Serrano that it would review previous documentation and asked Serrano to provide additional medical, vocational, or financial documentation. *Id.* at 1186. In two follow-up letters, Standard informed Serrano that because he had not sent any additional documentation, it would proceed with existing information, which had been referred to new consulting physicians. *Id.* at 1183–84. Serrano did not respond to these requests. *See id.* at 1170–71, 1177–78, 1180.

After the Administrative Review Unit's review, Standard reversed its earlier denial. In March 2018, Standard concluded that Serrano actually did meet the Own Occupation definition of disability in the LTD policy due to his "psychiatric condition." Adm. Rec. at 1182. Standard premised its decision on the opinions of specialists in orthopedics, Dr. Balint, and psychiatry, Dr. Welch, as well as another Vocational Case Manager, Paul Kangas. *Id.*; Doc. 38 at 9.

Balint noted that Serrano would be "able to work full time, 40 hours per week in a sustained capacity" with restrictions on the use of

his left shoulder, including no lifting, carrying, or pushing over 20 pounds occasionally, and up to 10 pounds frequently. Adm. Rec. at 578. He did not see anything in the operative report "that would indicate a potential for difficult[y] recovering from the [shoulder surgery]." *Id.* Balint expressed similar concerns as previous reviewers about Serrano's opioid use, writing that it is "very clear that [Serrano's] level of narcotic use would likely preclude safe driving as well as safe assessment and treatment of patients." *Id.* Balint did not think Serrano's pain medication use was reasonable given his symptoms and condition. *Id.*

Welch noted a "waxing and waning course of symptoms of depression" and determined that from June 2017 onward, Serrano "would have been limited from the temperamental demand of performing under stress when confronted with emergency, critical, unusually dangerous situations or situations in which speed and sustained attention are make or break aspects of the job." Adm. Rec. at 562. These limitations, according to Welch, stemmed from low mood, difficulty with concentration, and overall lethargy "arising from a combination of major depressive disorder and sleep schedule disruption, as well as likely due to the effects of chronic, high-dose opioid use." *Id.* Welch also found that although there "was no indication [Serrano] met criteria for opioid use disorder . . . there did not appear to have ever been a focused evaluation for addiction." *Id.*

**3.** In November 2018, Standard notified Serrano that it was reviewing his file according to its policy to determine whether payment of his LTD benefits should be "limit[ed] to 24 months for each period of continuous Disability caused or contributed to by Mental Disorders or Substance Abuse." Adm. Rec. at 610–11. Standard's letter provided the LTD plan's definitions of Mental Disorder and Substance Abuse. *Id.* at 611. "Mental Disorder" includes diagnoses of "depression and depressive disorders" and "anxiety and anxiety disorders." *Id.* at 75, 611. "Substance Abuse" is defined as "use of alcohol, alcoholism, use of any drug, including hallucinogens, or drug addiction." *Id.* Standard noted that Serrano's "Disability may be caused or contributed to by one or more of these [limited] conditions." *Id.* at 611. The letter further restated the LTD plan: "No LTD Benefits will be payable after the end of the limited pay period, unless on that date you continue to be Disabled as a result of a Physical Disease, Injury, or Pregnancy for which payment of LTD Benefits is not limited." *Id.* at 611. Standard informed Serrano of its intent to investigate and warned him that if a 24-month limitation were to apply, his claim would be closed on September 28,

7

2019. *Id.* at 611. Standard requested from Serrano any information that would indicate that the limitation should not apply. *Id.* at 611–12. Serrano did not submit any new information, but Standard had a medical authorization from which it could have obtained additional records. *See* Doc. 37 at 11; Doc. 48 at 4.

Standard then commenced a third review of Serrano's file. Standard referred the file to Dr. Hagle, a physician certified in pain management. Adm. Rec. 549–52. Hagle wrote only that he could not make an informed recommendation without more recent notes and imaging, as the materials that Standard sent him contained no records after March 2017. *Id.* at 551–52. On this limited review, Standard concluded in a letter dated December 2018 that Serrano's benefits were limited to 24 months because he was "[d]isabled by one or more conditions, including major depression or adjustment disorder with mixed anxiety and depression." *Id.* at 1076. Standard expressly did not apply the Limitation due to Substance Abuse as Hagle determined that the "available documentation [did] not support work limitations or restrictions due to drug use." *Id.* at 1077.

Standard considered whether Serrano was disabled by other conditions not subject to the 24-month limitation but, based on the previous findings of Balint and Hagle, determined that Serrano had no orthopedic or chronic pain limitations that would preclude him from performing as a general practitioner. Adm. Rec. at 1077. Standard provided Serrano with a questionnaire that he could complete and forms that his treating physicians could submit if Serrano wished to provide more information to challenge Standard's decision. *Id.* at 1077–78. Standard reports that it never received a completed questionnaire, Doc. 30 at 15, and Serrano cannot recall whether he completed one, Doc. 37 at 5.

Serrano responded through counsel to Standard's decision in January 2019, requesting "a full and complete copy of [his] entire claim file." Adm. Rec. at 1065. Later that month, Standard provided a copy of Serrano's LTD claim file and reiterated its finding that Serrano was not disabled by other conditions not subject to the Mental Disorders or Substance Abuse limitation. *Id.* at 1073–74. Standard also noted that it had yet to receive either updated information about Serrano's conditions and treatment or any authorization for Standard to obtain new information from providers. *Id.* Another series of letters and phone calls followed. *Id.* at 1054–58, 1048–50. Standard received authorization to obtain records from Serrano's physician, Dr. Kennedy. *Id.* at

1049. But in June 2019, while Standard was still collecting those records, Serrano initiated an administrative appeal of Standard's decision to close his claim. *Id.* at 1038.

**4.** As part of this second appeal, Serrano submitted additional information and medical records to Standard. By this time, Serrano had moved to Montana and begun seeing new doctors. *See* Adm. Rec. at 2201. In April 2019, Serrano began seeing a new primary care physician, Dr. Lyle, who thoroughly examined Serrano and saw him regularly. *Id.* at 2160–68. Lyle later provided a letter in which he summarized his findings up to that point and concluded, "Serrano is not able to work in his trained area of expertise due to his multiple ongoing health issues." *Id.* at 2159. Lyle noted Serrano's chronic fatigue and hypoxemia and found that any of his chronic conditions, "taken into account by themselves, would be more than enough to prevent Dr. Serrano from continuing to practice medicine." *Id.* Lyle indicated that Serrano's use of opioid pain medication "would impair his ability to take care of patients." *Id.*

In May 2019, Serrano visited Dr. Boyle, a psychiatrist, who diagnosed Serrano with major depressive disorder and reported his depression as recurrent and moderate. Adm. Rec. at 2246. Serrano also sought treatment from Eric Belanger, a P.A. in Pain Management, who addressed Serrano's opioid use and its likely effect on his other conditions. *Id.* at 2349. Belanger also discussed with Serrano short- and long-term effects of opioid use, including drowsiness, slowed breathing, and immune suppression. *Id.* at 2350. In June 2019, Serrano visited Dr. Ward, an orthopedist, who concluded that he had a "permanent restriction of no lifting more than ten pounds." *Id.* at 2197. Ward determined that Serrano should not return to work as an ER doctor because those duties require upper body strength. *Id.*

Dr. Kennedy, the physician who treated Serrano the longest, also provided input. In a June 2019 letter, Kennedy submitted an updated report with summaries of each of Serrano's health conditions. Adm. Rec. at 2406–11. Kennedy noted that Serrano's adrenal insufficiency continued to cause fatigue, necessitating 12 hours of sleep daily and restricting any significant activity. *Id.* at 2406. Kennedy did not provide new information regarding Serrano's insomnia, sleep apnea, and hypoxemia, but noted that he continued to suffer from these conditions. *Id.* at 2407–08. For Serrano's degenerative disc disease, Kennedy recounted Serrano's history and noted that his issues continued. *Id.* Kennedy referred to Serrano's consult visit with an orthopedic surgeon in

9

May 2019 that demonstrated "several areas consistent with avascular necrosis of the humeral head." *Id.* at 2409. Kennedy then recounted Serrano's chronic pain management history and summarized the various treatments used for pain management. *Id.* Finally, Kennedy mentioned Serrano's history of depression, anxiety, and ADHD. *Id.* at 2410. Kennedy wrote that, "[Serrano] does not feel that [his depression, anxiety, or ADHD] are contributing to his inability to work." *Id.* Kennedy found that Serrano's depression was "in remission." *Id.*

Upon receipt of these additional materials, Standard once more referred Serrano's file for independent evaluation. Adm. Rec. at 528. Dr. Alpert, who had not previously been consulted in connection with Serrano's claim, received the file in September 2019 and began her review. She reviewed four years of records—including primary care, pulmonology, cardiology, orthopedics, radiology, pain management, and psychiatry—and spoke directly with Lyle, Serrano's primary care physician at the time. *Id.* at 528–29. Lyle reportedly said Serrano's primary limitation was his pulmonary status. *Id.* at 529. When asked whether Serrano could perform primarily seated work, Lyle responded that Serrano's significant opioid use "could impair his judgment and [Lyle] did not think any kind of work was possible." *Id.* Alpert concluded that Serrano's medical information did not support limitations or restrictions from lifting up to ten pounds, keyboarding, sitting, standing, or walking. *Id.* at 536–37.

Standard thus upheld its previous decision to close Serrano's claim. Adm. Rec. at 1017. In an October 2019 letter, Standard noted that it gave "greater consideration [to] the records from around the time the Disabilities Subject To Limited Conditions period ended" in September 2019. *Id.* at 1024. Standard acknowledged Kennedy's disability opinion but pointed out that Kennedy had not personally seen or treated Serrano since 2015. *Id.* Standard further acknowledged Lyle's disability opinion but explained that, in his conversation with Alpert, Lyle had described Serrano's impairment as primarily related to his opioid use and had spoken about Serrano's occupational limitations in the context of Serrano's previous work in emergency medicine. *Id.* Standard concluded that Serrano could perform sedentary work within the scope of his license if not for his mental health issues or impairment due to use of opioids. *Id.* Standard affirmed its decision to close Serrano's LTD claim and informed him of his right to file suit under Section 502(a) of ERISA. *Id.* at 1024–25.

10

**5.** Serrano filed the present, three-count action against Standard in July 2020. Two of the counts allege that Standard's decision to deny Serrano disability benefits after September 27, 2019, was arbitrary and capricious. Doc. 1 at 9–10. The third count alleges that Standard's LTD policy is unenforceable because it is ambiguous and unconscionable in its Own Occupation definition of Disability. Doc. 1 at 11.[4] Serrano seeks to recover his denied disability benefits, plus interest, attorney fees, and costs. *Id.* at 11. Standard maintains that its decision to limit Serrano's benefits to 24 months was supported by the evidence. Doc. 30 at 33. The parties filed respective motions for summary judgment based on the administrative record. Docs. 29 & 32.

## II

Based on the administrative record, Standard's request for summary judgment is granted, and Serrano's is denied. Standard's closure of Serrano's LTD claim was not arbitrary and capricious. Its decision was founded on a reasoned basis and supported by substantial evidence. And although there appears some evidence of a conflict of interest, it is attenuated and does not undermine the reasonable bases for Standard's ultimate decision. Standard's denial of benefits is thus upheld.[5]

---

[4] Serrano appears to have abandoned this allegation. While it does appear in the Pretrial Order as a factual contention, Doc. 26 at ¶ 3.a., it is not listed as one of Serrano's legal claims, *id.* at ¶ 4.a, and is absent from his motion for summary judgment, Doc. 33-1, his reply, Doc. 46, and his memorandum opposing Standard's motion for summary judgment, Doc. 37. In his response to Standard's motion for summary judgment, Serrano concedes that his "Own Occupation" was a doctor of internal medicine, writing that he "does not contest the position" of Standard and that "[g]iven the language of the policy and the discretion of the Defendant to interpret the language of the policy, [Serrano] agrees that his "Own Occupation" will be the scope of his medical license and internal medicine board certification." Doc. 37 at 9. Accordingly, only the arbitrary and capricious claims are currently in dispute.

[5] Serrano made additional claims in his reply briefs in support of his summary judgment motion, such as a claim that Standard did not adequately notify Serrano of its decisions. *See, e.g.*, Doc. 46 at 11. Those new claims not raised in the initial brief are not considered. *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003); *see also Scott v. Union Sec. Ins. Co.*, No. 17-2686, 2019 WL 451189, at *7 (D. Kan. Feb. 5, 2019) (applying this rule in ERISA context).

### A

The crux of Serrano's principal arbitrary and capricious claim is that he was disabled by physical conditions and that Standard improperly classified his disability in the Mental Disorders or Substance Abuse category, thereby limiting his benefits to 24 months. Doc. 26 at 4. Serrano argues that Standard's review process was arbitrary and capricious because it unreasonably ignored evidence, including Dr. Kennedy's report and evidence of physical ailments such as adrenal insufficiency, to find that Serrano was not disabled with a qualifying physical limitation. Doc. 33-1 at 31. He characterizes these omissions as indicators of Standard's lack of reasonableness and good faith. *Id.* But Standard did review Kennedy's report and other evidence of physical ailments and decided the records as a whole supported its conclusion that Serrano was disabled by a limited condition. Adm. Rec. 1024.

Standard determined that mental disorders or substance abuse caused or contributed to Serrano's disability on three separate occasions. In Standard's 2017 review of Serrano's disability claim, Standard compiled all the documents submitted by Serrano, his physicians, and his employer and referred the file to Conant (psychiatry) and Mandiberg (orthopedics). Adm. Rec. at 1200. The medical records reviewed by Conant and Mandiberg included over 700 pages and spanned years of Serrano's medical history. *Id.* at 1428–2143. Mandiberg determined that Serrano's physical conditions would not limit his return to work. *Id.* at 589. Martin, the vocational case manager, supported this conclusion by noting several sedentary to light jobs that Serrano could perform. *Id.* at 1287.

When Serrano filed his first administrative appeal, Standard assigned two new specialists to review his file. Adm. Rec. 1182. Welch (psychiatry) and Balint (orthopedics) double-checked the initial file and reviewed Conant and Mandiberg's work. *Id.* at 560–62, 578–79 (mentioning a lack of post-surgery follow-up notes). Welch and Balint noted Serrano's mental health and opioid use would have prevented him from working in emergency situations and with patients. *Id.* at 560–62, 578. Physically, however, Balint concluded that Serrano could work with some physical restrictions. *Id.* at 578.

The mental health finding was enough for Standard to reverse itself. Standard determined that Serrano *had been* disabled in 2017, but not due to physical limitations. *See* Adm. Rec. at 1182. Standard's Administrative Review Unit concluded that Serrano had been disabled

under the Own Occupation definition of the LTD policy "due to symptoms of either major depressive disorder or an adjustment disorder with mixed anxiety and depression," based on Welch's conclusions. *Id.*

Standard's determination was reinforced by successive administrative reviews of Serrano's claim. After Serrano started to receive his disability payments, Standard notified him that it was reviewing his file to "determine whether any condition that caused or contributed" to his disability may be subject to the plan's 24-month limitation provision. Adm. Rec. at 610. As part of this review, Standard referred Serrano's file to Dr. Hagle, a pain management specialist. *Id.* at 549; Doc. 30 at 14. Hagle noted in November 2018 that there did not appear to be any limitations or restrictions due to chronic pain or drug use but that these determinations were based only on records through March 2017 and thus could not be made with certainty. Adm. Rec. at 552.

Serrano asserts that Hagle's review was unreasonable because Standard failed to provide him with up-to-date records. Doc. 44 at 25–26. While Serrano "ultimately carries the burden of showing he is entitled to benefits," Standard had a duty to "conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim." *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1324 (10th Cir. 2009). Standard had a list of Serrano's physicians and the forms necessary to obtain records. Doc. 44 at 26; Doc. 38 at 19. But by the time of this review, Standard had solicited updated medical information from Serrano on multiple occasions, Adm. Rec. 609–11, as well as an Activities and Capabilities Questionnaire and an Authorization to obtain additional treatment notes that he would want considered, *id.* at 1077. It does not appear from the record that Serrano submitted any new medical information in response to these requests. *Id.* at 1074. Moreover, Hagle's report was far from being the only evidence Standard relied on.

Following Standard's determination that Serrano was not disabled by other conditions not subject to the 24-month limitation, Serrano appealed and provided Standard with additional medical records, Doc. 30 at 15, including a June 2019 letter from his previous physician, Dr. Kennedy, Adm. Rec. at 2406–11. Standard then referred Serrano's records to Dr. Alpert, an independent consultant. Doc. 30 at 16. Alpert's extensive report details her review of medical records spanning four years, including those from Serrano's new providers in Montana. Adm. Rec. at 528–37. Alpert also called and discussed Serrano's health

conditions with Dr. Lyle. *Id.* at 528–29. Alpert concluded from her review of the records and from her conversation with Lyle that Serrano was not limited or restricted by a physical condition under Standard's terms. *Id.* at 536–37.

Thereafter, the Administrative Review Unit stuck to its determination that Serrano's specific disability subjected his benefits to a 24-month limitation. Adm. Rec. at 1017. It conceded that Serrano may continue to have pain related to his shoulder and that Kennedy indicated he would endorse a disability on Serrano's behalf. *Id.* at 1023–24. But Standard also observed that Kennedy had not seen Serrano since March 2015. *Id.* at 1024. As a consequence, Standard gave more weight to the "records from around the time the Disabilities Subject To Limited Conditions period ended"—*i.e.*, September 2019. *Id.* Standard's conclusion that Mental Disorders or Substance Abuse caused or contributed to Serrano's disability "was made on a reasoned basis and supported by substantial evidence." *Van Steen*, 878 F.3d at 997.

Standard's decision must be upheld because it is supported by a reasonable basis. *See Kimber*, 196 F.3d at 1098 (a decision will survive arbitrary and capricious review "unless it is not grounded on *any* reasonable basis" (citation omitted)). Standard based its decision on multiple providers' professional opinions and a record that stretched back several years. In 2017, Conant first found that the record supported diagnoses of depression and opioid dependence, as well as anxiety and other mental health concerns, Adm. Rec. at 593, and this continued through Welch's review in 2018, *id.* at 560–62, and Alpert's in 2019, *id.* at 529, 536. Standard's determination that Serrano was limited in his capacity based on his mental health and use of opioids was based on "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker." *Graham*, 589 F.3d at 1358 (quoting *Sandoval*, 967 F.2d at 382). There was "more than a scintilla" of evidence here to determine Serrano was disabled as a result of a limited condition. *Id.* Serrano even acknowledges that he "cannot make critical decisions affecting patients and patient care that are required of a physician" due to his opioids use. Doc. 33-1 at 42. At the same time, there was "more than a scintilla" of evidence to conclude that Serrano was not disabled because of physical conditions. Numerous doctors and consultants concluded that he could continue working in his Own Occupation, albeit with restrictions.

Standard was not unreasonable or unfair when it weighed all of the evidence and concluded that Serrano had presented no evidence of

significant limitations beyond his mental health conditions and opioid use. Adm. Rec. at 1024. When conducting an ERISA review, courts are not to "substitute [their] own judgment for that of the plan administrator unless the administrator's actions are without any reasonable basis." *Geddes v. United Staffing All. Emp. Med. Plan*, 469 F.3d 919, 929 (10th Cir. 2006) (citing *Woolsey v. Marion Lab.*, 934 F.2d 1452, 1460 (10th Cir. 1991)). And other ERISA cases in this jurisdiction have concluded that the amount and type of evidence that Standard considered constitutes "substantial" evidence. *See, e.g.*, *Ellis v. Liberty Life Assurance Co. of Boston*, 958 F.3d 1271, 1293 (10th Cir. 2020) (finding for insurer that had relied on two medical experts and gave less weight to plaintiff's evidence); *Winfrey v. Hartford Life & Accident Ins. Co.*, 127 F. Supp. 3d 1153, 1168–69 (D. Kan. 2015) (concluding that insurer's decision to deny an initial benefit claim was reasonable and based on substantial evidence from multiple physicians and experts).

Moreover, just because some evidence "support[s] [Serrano]'s claim does not render a denial of benefits unreasonable," nor does it suggest a lack of substantial evidence. *Ellis*, 958 F.3d at 1295. Indeed, Standard sought and reviewed extensive medical records to discover the nature of Serrano's condition and it built a claim file of significant scope and scale. *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009). Based on the insurer's review of all the evidence at its disposal—good, bad, or indifferent—it cannot be said that Standard abused its discretion when it denied Serrano's benefits based on a lack of substantial evidence. *See Holcomb*, 578 F.3d at 1193–94 (upholding benefits denial after insurer "had received a large volume of reports, letters, imaging studies, and exams that were not entirely consistent"). Quite the opposite. No matter the conflict, there was substantial evidence supporting Standard's determination.

An unpublished Tenth Circuit decision, *Schwob v. Standard Ins. Co.*, 248 F. App'x 22 (10th Cir. 2007), is helpful to the analysis.[6] The plan there had similar language limiting to 24 months disability "caused or contributed to" by a mental disorder. *Id.* at 25. Although three of the claimant's treating physicians submitted statements supporting her claim that physical illness caused her disability, *id.* at 26, other evidence indicated that depression was the cause, *id.* at 28. The Tenth Circuit affirmed the benefits denial because substantial evidence supported a

---

[6] *Schwob* is unpublished and not precedential, *see* D. Kan. R. 7.6(c), but the factual similarity between it and this case makes its reasoning particularly persuasive.

15

finding that a mental disorder contributed to her disability regardless of whether its origin was physical disease. *Id.* at 29. The court found that even if the claimant's depression co-existed with or was secondary to physical illness, the insurer could still apply the mental disorder limitation because it contributed to her disability. *Id.* at 28–29. The record contained reports from various doctors indicating that the claimant suffered from a mental condition such that the limitation applied. *Id.* So too here. Standard based its decision on years of medical records and providers' opinions. This does not mean finding that the limitation applied was the only permissible conclusion, just that it was one "predicated on a reasoned basis." *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

Standard did not disregard Kennedy's report and opinions. *Contra* Doc. 33-1 at 29. Rather, it weighed Kennedy's observations in the context of the many other providers' opinions. Standard did not have to afford Kennedy more weight than all the other doctors just because he was a treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832–33 (2003). And considering the long period of time that elapsed between Kennedy's treatment of Serrano and his letter, Standard did not act unreasonably by weighing Kennedy's opinion as it did.

Serrano further argues that Standard's failure to provide him with Alpert's report prior to denying his appeal improperly denied him the ability to refute it. Doc. 33-1 at 29; Doc. 37 at 11–13; Doc. 46 at 12. Prior to Alpert's review, Standard provided Serrano with a copy of his entire claim file. Adm. Rec. at 1073. Alpert reviewed extensive medical records, many of which Serrano provided. *Id.* at 528–29. Serrano "knew all of the facts" Standard considered because the evidence relied on was not new, *contra* Doc. 46 at 13, and he had a fair opportunity to provide information to support his claim when he submitted his appeal. *Rizzi v. Hartford Life & Acc. Inc. Co.*, 383 F. App'x 738, 756 (10th Cir. 2010). Alpert agreed with previous consultants when she found that Serrano was not disabled by other conditions not subject to the 24-month limitation. Adm. Rec. at 1017, 1077. Following Alpert's report, Standard sent a letter to Serrano detailing its reasons for upholding the decision to close his claim. *Id.* at 1017–25. This letter was not the first time that Serrano learned that the limitation may be applied. More than a year before this letter, Standard provided him with the policy's language regarding the limitation and notified him that it was reviewing his file to see whether the limitation applied. *Id.* at 610–12. Alpert's report did not rely on new information, nor did Standard deny

16

Serrano's claim based upon novel grounds. Put simply, it was not necessary to provide Alpert's report prior to denying his appeal. *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th Cir. 2007) ("Permitting a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal—even when those reports contain no new factual information and deny benefits on the same basis as the initial decision—would set up an unnecessary cycle of submission, review, re-submission, and re-review.").

Considering the number of reviews, their scope, and the variety of sources from which they came, Standard acted reasonably and on the basis of substantial evidence when it determined that Serrano did not have a qualifying disability that prevented him from performing his Own Occupation that was independent of Mental Disorders or Substance Abuse.

**B**

Serrano also argues that Standard's decision-making was so tainted by a conflict of interest as to make its decision to deny benefits arbitrary and capricious. Doc. 26 at 4. But any potential conflict of interest was attenuated and did not render Standard's denial arbitrary and capricious.

Serrano asserts that Standard had a conflict of interest because it was both the insurer and the plan administrator and Standard should therefore receive less deference regarding its decision to limit Serrano's benefits. Doc. 33-1 at 17–18. Standard's dual role as "both insurer and administrator of the plan" does create an "inherent conflict of interest between its discretion in paying claims and its need to stay financially sound." *Graham*, 589 F.3d at 1358 (quoting *Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1296 n.4 (10th Cir. 2000)). But that does not change the outcome.

In these situations, courts are to balance the conflict of interest "as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); *see also Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) ("[W]e dial back our deference if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." (citation, internal quotation marks, and emphasis omitted)). Under pre-*Glenn* case law, the Tenth Circuit used a burden-shifting approach wherein the administrator had to "establish

17

by substantial evidence that the denial of benefits was not arbitrary and capricious" in situations where a conflict existed. *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1005 (10th Cir. 2004). But *Glenn* made clear that courts are to employ a "combination-of-factors method of review" and regard conflicts as "more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." 554 U.S. at 117–18; *see also Holcomb*, 578 F.3d at 1193 (clarifying that the pre-*Glenn* rule, whereby conflicted plan administrators had the sole burden to prove the legitimacy of their actions, no longer applies). By the same token, conflicts "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117.

Standard claims that its determination was not the result of bias and that it took multiple steps to mitigate potential bias. Doc. 48 at 3. It points to the fact that its Administrative Review Unit reversed the initial denial and paid out 24 months of benefits. *Id.*; *see also* Adm. Rec. at 1180–82. Standard also repeatedly asked Serrano for updated records, had new consultants review Serrano's file on each round of review, and had different teams handle the claim and the administrative reviews. These steps were sufficient to mitigate any conflict of interest that Standard had. *Holcomb*, 578 F.3d at 1193; *see also Loughray v. Hartford Grp. Life Ins. Co.*, 366 F. App'x 913, 924–25 (10th Cir. 2010) (observing there was no "significant risk" that insurer's conflict affected its decision where insurer employed an independent medical examiner and considered materials the insured submitted).

*Holcomb* is particularly instructive. There, the court concluded the insurer did not abuse its discretion by denying benefits to a claimant considering the steps it took to reduce its bias. 578 F.3d at 1193. The insurer hired two independent physicians—one to review the claimant's file and another to examine her. *Id.* Moreover, the insurer "diligently endeavored to discover the nature of [the claimant's] ailments." *Id.* The insurer took many of the same steps that Standard did here: it "routinely request[ed] [the claimant's] updated medical records" and "solicited expert evaluations from independent medical and psychological examiners, and it performed both vocational assessments and occupational analyses." *Id.* Ultimately, the *Holcomb* Court concluded that the insurer's decision to deny benefits was not an abuse of discretion even with the insurer-plan administrator conflict of interest. *Id.* at 1194.

So too here. Standard conducted four reviews of Serrano's case file. Each review included a new set of doctors with appropriate backgrounds and skillsets. Standard gave more weight to the doctors' opinions from the time the "Disabilities Subject to Limited Conditions period ended" in 2019. Adm. Rec. at 1024. Moreover, Standard decided to give less credence to Kennedy's opinion because he appeared to have not seen Serrano for several years. *Id.* Standard repeatedly attempted to solicit updated records from Serrano and considered the items he submitted. This was beyond what *Holcomb* concluded sufficiently offset any insurer-plan administrator conflict. *See* 578 F.3d at 1194. And nothing within the Administrative Record suggests this conflict of interest had any bearing on Standard's decision to deny extending Serrano's LTD benefits. The conflict did not so infect Standard's review as to render it arbitrary and capricious.

### III

For the reasons set forth above, Defendant's Motion for Judgment on the Administrative Record, Doc. 29, is GRANTED, and Plaintiff's Motion for Summary Judgment, Doc. 32, is DENIED.

It is so ordered.

Date: December 5, 2022                                   s/ Toby Crouse
                                                         Toby Crouse
                                                         United States District Judge